[No. C046211. Third Dist. Sept. 8, 2006.]

EL DORADO IRRIGATION DISTRICT, Plaintiff and Appellant, v. STATE WATER RESOURCES CONTROL BOARD, Defendant and Appellant;
STATE WATER CONTRACTORS, INC., et al., Real Parties in Interest and Appellants;
DEPARTMENT OF WATER RESOURCES, Real Party in Interest and Respondent.

EL DORADO COUNTY WATER AGENCY, Plaintiff and Appellant, v. STATE WATER RESOURCES CONTROL BOARD;
Defendant and Appellant;
STATE WATER CONTRACTORS, INC., et al., Real Parties in Interest and Appellants;
DEPARTMENT OF WATER RESOURCES, Real Party in Interest and Respondent.

938

940

## Counsel

Somach, Simmons & Dunn, Sandra K. Dunn, Nicholas A. Jacobs; and Frederic L. Schaefer for Plaintiff and Appellant El Dorado County Water Agency.

Somach, Simmons & Dunn, Sandra K. Dunn, Nicholas A. Jacobs; and Thomas D. Cumpston for Plaintiff and Appellant El Dorado Irrigation District.

Christopher D. Williams for Mountain Counties Water Resources Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Mason, Robbins, Gnass & Browning and Arthur F. Godwin for Regional Council of Rural Counties as Amicus Curiae on behalf of Plaintiffs and Appellants.

Danial F. Gallery and Jason P. Cashman for Tuolumne Utilities District as Amicus Curiae on behalf of Plaintiffs and Appellants.

Herum Crabtree Brown and Jeanne Zolezzi for Stockton East Water District as Amicus Curiae on behalf of Plaintiffs and Appellants.

Downey Brand, Kevin M. O'Brien and Robia S. Chang for Northern California Water Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Thomas J. Graff for Environmental Defense as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bartkiewicz, Kronick & Shanahan, Ryan S. Bezerra and Paul M. Bartkiewicz for Regional Water Authority as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Marc N. Melnick and Tiffany Yee, Deputy Attorneys General, for Defendant and Appellant.

Nancy Saracino, David B. Anderson and David Sandino for Department of Water Resources as Amicus Curiae on behalf of Defendant and Appellant.

Best Best & Kreiger, Gregory K. Wilkinson and Eric L. Garner for Real Party in Interest and Appellant State Water Contractors, Inc.

Kronick, Moskovitz, Tiedemann & Girard, Daniel J. O'Hanlon and Andrew P. Tauriainen for Real Party in Interest and Appellant Westlands Water District.

Nancy Saracino, David B. Anderson and David Sandino for Real Party in Interest and Respondent.

OPINION

**ROBIE, J.**—In this water rights case, El Dorado Irrigation District and El Dorado County Water Agency (jointly El Dorado) sought and received from the State Water Resources Control Board (the Board) the assignment of an application to appropriate water from the South Fork of the American River that was filed by the state more than 75 years ago, in 1927. The benefit of the assignment of this state-filed application was that El Dorado's right to divert water would be deemed senior to other appropriative rights based on applications filed after 1927.

Ultimately, however, the Board decided to include in El Dorado's permit a standard term (term No. 91) that requires the appropriator to curtail its diversion of water when the United States Bureau of Reclamation (the Bureau) and/or the Department of Water Resources (the Department) are releasing stored water from the Central Valley Project (the CVP) and/or the State Water Project (the SWP) to meet water quality objectives in the Sacramento-San Joaquin Delta.[1] The Board included this term in El Dorado's permit even though other water users in the Delta watershed with appropriative water rights based on applications filed after 1927 are not bound by this restriction.

El Dorado brought this administrative mandamus proceeding in the superior court to challenge the Board's inclusion of term No. 91 in its permit. The trial court agreed with El Dorado that by including term No. 91 in El Dorado's permit, but not in the permits and licenses of other junior appropriators, the Board "contravened . . . critical statutory policies for the appropriation of water: a rule of priority set forth in Water Code section 10500 and area of origin protections set forth in Water Code sections 10505, 10505.5 and 11460–11[4]63." Accordingly, the trial court ordered the issuance of a writ of mandate directing the Board to set aside its decision to include term No. 91 in El Dorado's permit, although the Board could conduct further proceedings on El Dorado's petition for assignment of the state-filed application to determine appropriate conditions relating to El Dorado's responsibility for Delta water quality.

The Board and two other parties with interests in water from the projects— Westlands Water District (Westlands) and State Water Contractors—have appealed from the judgment, arguing the trial court erred in directing the Board to remove term No. 91 from El Dorado's permit.[2] In turn, El Dorado has cross-appealed from the judgment to attack the interlocutory ruling of the trial court that made the Bureau, the Department, Westlands, and State Water Contractors parties to the action.

As will be seen, we agree with the trial court that the Board abused its discretion in imposing term No. 91 on El Dorado's permit, when it has not included that term in the permits and licenses of appropriators in the Delta watershed whose rights are junior to those of El Dorado's. The Board's action contravened the rule of priority, which is one of the fundamental principles of California water law, because appropriators junior to El Dorado can divert

---

[1] We will refer to the CVP and the SWP jointly as the projects.

[2] Westlands is a water district situated on the west side of the San Joaquin Valley in Fresno and Kings Counties that receives CVP water from the Bureau exported from the Delta. State Water Contractors is a nonprofit association comprised of 27 public agencies that have contracts with the Department to receive water from the SWP.

water when El Dorado cannot. Although the rule of priority is not absolute, the Board is obligated to protect water right priorities unless doing so will result in the unreasonable use of water, harm to values protected by the public trust doctrine, or the violation of some other equally important principle or interest.

Such is not the case here. To the extent the restriction on El Dorado's right to divert water serves to protect water stored by the projects for export to other regions of the state, the Board has not shown that its interest in protecting the projects' stored water is of greater importance than the rule of priority. Similarly, although the Board has a legitimate interest in requiring El Dorado to contribute natural flow that it would otherwise divert toward meeting water quality objectives in the Delta, the Board has not shown that its interest in requiring a contribution from El Dorado justifies the subversion of the rule of priority, which has occurred here only because the Board has chosen not to seek similar contributions from what appear to be hundreds of appropriators in the Delta watershed junior to El Dorado. Indeed, by imposing term No. 91 on El Dorado but not on other, junior appropriators, the Board's goal of helping meet Delta water quality objectives with natural flow, rather than the projects' stored water, is undercut because natural flow that El Dorado bypasses to improve water quality in the Delta can be diverted by those junior appropriators. Thus, it is questionable the extent to which the limitation imposed on El Dorado will actually serve its ostensible purposes. For this reason, we conclude the Board abused its discretion because the imposition of term No. 91 in these circumstances subverted the rule of priority without adequate justification.

We disagree with the trial court that the Board's action contravened the county of origin and area of origin statutes in the Water Code, but we likewise reject any argument that those statutes require the inclusion of term No. 91 in El Dorado's permit.

Finally, we conclude El Dorado does not have standing to appeal from the judgment in its favor to challenge an adverse interlocutory ruling ordering El Dorado to join the Bureau, the Department, Westlands, and State Water Contractors as real parties in interest.

Accordingly, we will dismiss El Dorado's cross-appeals and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The History of Comprehensive Water Planning in California*

This case has its roots in what is perhaps California's most fundamental water problem, which Erwin Cooper described as "maldistribution of moisture in relation to human needs." (Cooper, Aqueduct Empire: A Guide to Water in California, Its Turbulent History and Its Management Today (1968) p. 35 (hereafter Cooper, Aqueduct Empire).) As former Presiding Justice John T. Racanelli explained in *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 98 [ 227 Cal.Rptr. 161]: "California's critical water problem is not a lack of water but uneven distribution of water resources. The state is endowed with flowing rivers, countless lakes and streams and abundant winter rains and snowfall. But while over 70 percent of the stream flow lies north of Sacramento, nearly 80 percent of the demand for water supplies originates in the southern regions of the state."

Efforts to solve this problem date back more than 100 years. In the early 1870's, President Ulysses Grant appointed a commission under the leadership of Colonel B. S. Alexander (Alexander Commission), to study California's "irrigation problem." (Cooper, Aqueduct Empire, *supra*, p. 42.) The Alexander Commission "was the first to point out . . . that the Central Valley's most bountiful water supplies lay in the Sacramento River region, in contrast to potential shortages in the valley of the San Joaquin." (*Id.* at pp. 42–43.) The commission "made several proposals for basin-wide storage and distribution of water." (*Id.* at p. 42.)

The work of the Alexander Commission was followed in the late 1870's by the work of William Hammond Hall, the first State Engineer, who was appointed to investigate, among other things, "the problems of irrigation" in California. (Stats. 1878, ch. 429, § 3, p. 634; Cooper, Aqueduct Empire, *supra*, at p. 43.) Hall "took his assignment seriously and spoke out for coordinated region-wide water development. But in that respect he was a generation ahead of his time. . . . In a time of rampant self-interest Hall's farsighted vision of systematic development went largely unrecognized." (Cooper, *supra*, at pp. 43–44.)

Forty years later, in 1919, Colonel Robert Bradford Marshall, chief hydrographer of the United States Geological Survey, followed in Hall's footsteps when he "proposed to the governor of California a series of storage reservoirs and canals in the Central Valley." (Cooper, Aqueduct Empire, *supra*, at p. 50; see also Rogers & Nichols, Water for Cal. (1967) § 27, p. 46.) "[I]n the hortatory language of a crusader, [Colonel Marshall] sketched, summarized and espoused for California the inevitable water logistics which seventy years

of cumulative geographic and hydrologic evidence demanded: redistribution of water from north to south; an integrated system of statewide waterworks; the Central Valley Project in all its splendid promise; the east and west side canals flanking that valley; tunnels and pumps conveying to southern California a share of the state's endowment." (Cooper, *supra*, at pp. 50–51.)

In 1921, the California Legislature took up the search for a solution to California's water problem when it directed the state engineering department "to determine a comprehensive plan for the accomplishment of the maximum conservation, control, storage, distribution and application of all the waters of the state, and to estimate the cost of constructing dams, canals, reservoirs or other works necessary in carrying out this plan." (Stats. 1921, ch. 889, § 4, p. 1686.) Development of this comprehensive water plan for California continued over the next decade, with periodic reports to the Legislature. (See Rogers & Nichols, Water for Cal., *supra*, § 27, p. 46; *Ivanhoe Irr. Dist. v. All Parties* (1957) 47 Cal.2d 597, 614 [306 P.2d 824], revd. 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174].)

In 1927, while the water plan was still being developed, a joint Senate-Assembly committee recognized the need " 'to file on, or withdraw from filing by private parties, the water rights to be utilized and required for the consummation of the co-ordinated plan.' " (25 Ops.Cal.Atty.Gen. 8, 11 (1955).) Accordingly, the Legislature passed the Feigenbaum Act (Stats. 1927, ch. 286, pp. 508–510), which was later codified as Water Code section 10500 et seq.[3] (See 25 Ops.Cal.Atty.Gen., *supra*, at p. 11.) The Feigenbaum Act directed the Department of Finance "to make and file an application or applications for any water or the use thereof which in the judgment of the state department of finance is or may be required in the development and completion of the whole or any part of a general or coordinated plan looking towards the development, utilization or conservation of the water resources of the state." (Stats. 1927, ch. 286, § 1, pp. 508–509; see § 10500.) The act further provided that the priority of any such application would be the effective date of the act, which was July 29, 1927.[4] (Stats. 1927, ch. 286, § 1, p. 508.) "The effect of the [Feigenbaum Act] was to withdraw the then unappropriated waters of the State filed on by the Department of Finance from any further appropriation by private parties." (25 Ops.Cal.Atty.Gen., *supra*, at p. 11.) The Feigenbaum Act also gave the Department of Finance the "power, in its discretion, to release from priority or to assign any portion of or all of any of the appropriations that may be filed under the provisions of this act when such release or assignment is for the purpose of development

---

[3] All further statutory references are to the Water Code unless otherwise indicated.

[4] The Feigenbaum Act was later amended to provide that applications filed pursuant to the act "shall have priority, as of the date of filing, over any application made and filed subsequent thereto." (§ 10500.)

not in conflict with such general or coordinated plan." (Stats. 1927, ch. 286, § 1, p. 509; see § 10504 ["The board may release from priority or assign any portion of any application filed under this part when the release or assignment is for the purpose of development not in conflict with such general or coordinated plan or with water quality objectives established pursuant to law"].)

"It was under th[e] authorization [of the Feigenbaum Act] that the Director of Finance, beginning in 1927, filed some 37 applications on behalf of the state on streams within the central valley area . . . ." (*Ivanhoe Irr. Dist. v. All Parties*, *supra*, 47 Cal.2d at p. 614.) One of those state-filed applications, application No. 5645, was filed on July 30, 1927. That application sought a permit to appropriate for irrigation and domestic use various amounts of water from various points in El Dorado County on tributaries to the American and Cosumnes Rivers, including—as relevant here—the South Fork of the American River.

### The History of the Area of Origin Protections

In 1931, the Division of Water Resources submitted a comprehensive series of reports on the State Water Plan to the Legislature. (25 Ops.Cal.Atty.Gen., *supra*, at p. 13.) That same year, "the Legislature was called upon to amend the Feigenbaum Act of 1927 by extending the date to which State filings would be exempted from requirements of diligence." (*Id.* at p. 14.) The bill introduced to make this amendment "was [itself] amended before final passage to provide a further restriction on the authority of the Department of Finance to release from priority or to assign any of the State's filings." (*Ibid.*) Specifically, the Legislature amended the Feigenbaum Act to provide that "no such priority shall be released, or assignment made of any such appropriation that will, in the judgment of the state department of finance, deprive the county in which such appropriated water originates, of any such water necessary for the development of such county." (Stats. 1931, ch. 720, § 1, pp. 1514–1515.) This amendment was the culmination of several attempts since 1925 "to protect the counties of origin against exportation of water which might be needed by them in their own future development." (25 Ops.Cal.Atty.Gen., *supra*, at p. 12.)

Two years later, in 1933, "[a]s the result of the prolonged studies and planning by the state, the Legislature . . . enacted a statute designating the Sacramento-San Joaquin coordinated project as the Central Valley Project" (the CVP). (*Ivanhoe Irr. Dist. v. All Parties*, *supra*, 47 Cal.2d at p. 614.) Part of the Central Valley Project Act of 1933 was a provision that later became section 11460, which provides: "In the construction and operation by the department of any project under the provisions of this part a watershed or

area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein."[5] (Stats. 1933, ch. 1042, § 11, pp. 2650–2651.)

### The CVP

"Construction of the CVP began in 1937. It is now one of the world's most extensive water transport systems. . . . Shasta Dam on the upper Sacramento River is the focal point of the CVP. Shasta Dam was completed in 1945 but began storing water and generating electric power in 1944. The waters of the Sacramento River which flow past the Shasta Dam are augmented by additional water supplies brought through a tunnel from the Trinity River and from reservoirs formed by Folsom and Nimbus Dams on the American River. About 30 miles south of Sacramento, the Delta Cross Channel regulates the passage of Sacramento River water through the Delta to the Tracy Pumping Plant.

"At Rock Slough, a portion of the water is pumped into the Contra Costa Canal for municipal uses in Contra Costa County. At the Tracy Pumping Plant, the water is lifted nearly 200 feet above sea level into the Delta[-]Mendota Canal and flows 117 miles southward to the Mendota Pool. Here, the waters from the north replace the natural flow of the San Joaquin River. At Friant Dam, the flow of the San Joaquin River is impounded and diverted through the Friant-Kern Canal 152 miles south to the southern reaches of the San Joaquin Valley." (*United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 99.)

The appropriative water rights necessary for operation of the CVP included rights acquired by assignment of various state-filed applications. Indeed, as of 1957, "[t]he greater portion of water to which the United States ha[d] acquired rights [wa]s by assignments from the state's Director of Finance. [Citation.] Four assignments of applications for the appropriation of unappropriated water of the Sacramento River, totaling 35,000 second-feet diversion and 12,690,000 acre-feet annual storage, were made on September 3, 1938.

---

[5] Although on its face this provision applies only to the Department, section 11128 makes the statute applicable to the Bureau as well. "The limitations prescribed in Section 11460 and 11463 shall also apply to any agency of the State or Federal Government which shall undertake the construction or operation of the project, or any unit thereof, including, besides those specifically described, additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part." (§ 11128.)

On September 30, 1939, three assignments of applications for the appropriation of unappropriated water of the San Joaquin River, totaling 9,500 second-feet diversion and 4,420,000 acre-feet annual storage, were made to the United States." (*Ivanhoe Irr. Dist. v. All Parties, supra*, 47 Cal.2d at p. 618.)

### The SWP

"Following World War II, state authorities renewed their efforts to develop a comprehensive statewide water plan. In 1951 the Legislature authorized the Feather River and Sacramento-San Joaquin Delta Diversion Project. [Citation.] This project—referred to as the SWP—began operations in 1967 under management of the [Department]. Water from the Feather River is stored behind Oroville Dam and is released into the Feather River and its eventual confluence with the Sacramento River. The water flow continues through the Delta to the Clifton Court Forebay [in the southern Delta] where a portion of it enters the South Bay Aqueduct for delivery to [urban and agricultural areas in Alameda and Santa Clara Counties]. A much greater portion is lifted [at the Harvey O. Banks Delta Pumping Plant] into the Edmund G. Brown California Aqueduct for transport through the San Joaquin Valley and eventually again lifted by a series of pumping stations over the Tehachapi Mountains for delivery and use in the Southern California region." (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at pp. 99–100, fn. omitted.)

### Water Rights for the Federal and State Projects

In 1958—after initial construction of the CVP was already complete and the project was already in operation—the first permits to appropriate water were issued to the Bureau for the project; the principal permits were issued three years later, in 1961. Six years after that, in 1967, the permits for the SWP were issued. (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at p. 106.)

Meanwhile, due to incomplete information regarding water availability, in 1965 the State Water Rights Board (the Water Rights Board)[6] began inserting a standard permit term known as term No. 80 into permits issued for the

---

[6] The Water Rights Board was created by the Legislature in 1956, independent from the Department, to serve as a quasi-judicial body with the responsibility for administering water rights. (See Stats. 1957, 1st Ex. Sess. 1956, ch. 52, § 7, pp. 425–427; Assem. Interim Com. on Water, A Proposed Water Resources Control Board for Cal., A Staff Study (July 1966) pp. 19–21.)

In 1967, the Legislature consolidated the Water Rights Board with the State Water Quality Control Board to create a new agency—the State Water Resources Control Board. (Stats. 1967, ch. 284, p. 1441.)

appropriation of water within the Sacramento-San Joaquin Delta watershed. Term No. 80 reserved the Water Rights Board's jurisdiction over the permits "for the purpose of conforming the season of diversion to later findings of the Board on prior applications involving water in the Sacramento River Basin and Delta."

"In 1976 the Board convened a hearing for two declared purposes: to formulate a water quality control plan for the Delta and to determine whether the water-use permits held by the . . . Bureau and the [Department] should be amended to implement the plan. In August 1978, following an extensive evidentiary hearing over an 11-month period, the Board adopted the 'Water Quality Control Plan for the Sacramento-San Joaquin Delta and Suisun Marsh' [the 1978 Delta Plan] . . . and 'Water Right Decision 1485'. . . . [¶] In the [1978 Delta] Plan the Board established new water quality standards for salinity control and for protection of fish and wildlife in the Delta and Suisun Marsh. In D[ecision] 1485 the Board modified the permits held by the . . . Bureau and the [Department], compelling the operators of the projects to adhere to the water quality standards as set out in the Plan." (*United States v. State Water Resources Control Bd., supra*, 182 Cal.App.3d at pp. 97–98.) As the Board itself later explained in decision No. 1594, the effect of decision 1485 was "to require the Projects to release water from storage or to curtail diversions when the flow entering the Delta would otherwise be insufficient to meet the water quality standards" set in the 1978 Delta Plan.

*Term No. 91 and the Protection of the Projects' Stored Water*

Following the Board's adoption of decision No. 1485, the Bureau and the Department protested most of the water right applications in the Delta watershed because diversion of water by new applicants would, at certain times, require the projects to release more stored water to meet Delta water quality objectives, and they believed all new appropriators within the Delta watershed should share in the responsibility for meeting those objectives. As an interim solution, to avoid withholding action on the protested applications, the Board adopted standard water right permit term No. 91 on March 25, 1980. According to the Board, "Term 91 prohibits permittees from diverting water when stored Project water is being released to meet Delta water quality standards or other inbasin demands." Meanwhile, in April 1980, the Board authorized a water availability study to develop a long-term solution that would address the projects' concerns. Around this same time, the Board revised term No. 80 so that it reserved the Board's jurisdiction "to change the season of diversion to conform to the results of a comprehensive analysis of the availability of unappropriated water in" the basin or watershed of the applicable permit.

In order No. WR 81-15, issued in November 1981, the Board adopted a method for calculating when term No. 91 conditions exist. In effect, water is considered unavailable for appropriation under term No. 91 when the amount of water the projects are releasing from storage in the Shasta, Oroville, and Folsom reservoirs, plus the amount of water the Bureau is importing from the Trinity River, exceeds the amount of water the projects are exporting from the Delta plus "carriage water," which is "the amount of additional Delta outflow required to compensate for currents created by the export pumps." Under such circumstances, the projects are deemed to be releasing their own stored or imported water to meet Delta water quality objectives or other inbasin demands.

In order No. WR 81-15, the Board determined that because "Term 91 is an interim measure, and was developed as a result of Project operator protests precipitated by the adoption of Board Decision 1485 on August 16, 1978, Term 91 shall apply only to permits and licenses having a priority date after August 16, 1978." The Board anticipated that term No. 91 would be "replaced by the results of the Board's Water Availability Study for the Sacramento-San Joaquin Delta Watershed."

Originally, Board staff "proposed a comprehensive analysis of water supply and demand which attempted to identify and quantify water usage by all diverters below the foothill reservoirs within the Delta watershed." That approach was discontinued, however, due to lack of adequate data. At a hearing in April 1983, the Board considered several other methods for determining water availability in the Delta watershed. Ultimately, however, the Board decided to adopt the term No. 91 methodology on a long-term basis. In decision No. 1594 issued in November 1983, the Board announced that it would continue including term No. 91 in new permits for diversion in the Delta watershed (with certain exceptions not applicable here). The Board also added term No. 91 to many of the term No. 80 permits that did not already include term No. 91. The Board found "the Term 91 Method to be a simple and acceptable method for determining water availability on a real-time basis."[7]

*El Dorado's Water Right Applications*

Meanwhile, in May 1980, El Dorado had filed applications for the proposed South Fork American River (SOFAR) project, which involved diversions from the South Fork of the American River and many of its tributaries. In

---

[7] The Board deleted both term No. 80 and term No. 91 from all permits that authorized direct diversion of less than 1.0 cubic-foot per second or diversion to storage of less than 100 acre-feet per year because the Board determined it was "inefficient to establish real-time regulation of hundreds of parties diverting small quantities of water."

connection with that project, El Dorado also petitioned for assignment of various state-filed applications, including application No. 5645.[8]

In decision No. 1587, issued in November 1982, the Board partially approved one of El Dorado's applications, partially assigned various state-filed applications to El Dorado (including application No. 5645), and issued permits on those applications. The Board also released another state-filed application from priority in favor of the applications it had approved and assigned. The Board included term No. 91 in all of the permits it issued to El Dorado, including the permits issued on the state-filed applications, on the ground that "any release from priority or assignment of state-held applications should include conditions to protect Delta water quality objectives." Apparently El Dorado did not challenge the Board's decision to include term No. 91 in its permits.

The following year, in decision No. 1594, when it added term No. 91 to many of the term No. 80 permits that did not already include term No. 91, the Board retained term No. 91 in the permits for the SOFAR project.

In March 1991, El Dorado filed four applications to appropriate water from Silver Lake, Caples Lake, Lake Aloha, and the South Fork of the American River.[9] The following year, in May 1992, having decided not to pursue the SOFAR project, El Dorado surrendered the permits for that project and reassigned the state-filed applications for that project to the Board. At the same time, El Dorado once again petitioned for partial assignment of state-filed application No. 5645. El Dorado explained that the new petition covered the same water rights as the four applications it had filed in March 1991 and that it would seek water rights under the state-filed application as the "first option," with water rights under the 1991 applications "only as an alternative."

As amended in 1994, El Dorado's applications and petition for partial assignment sought to appropriate water for storage at the three lakes and to appropriate water for direct diversion at Folsom Reservoir. The total amount of water sought by direct diversion and rediversion from storage was not to exceed 17,000 acre-feet per year, with the total amount to be taken by direct diversion not to exceed 15,000 acre-feet per year. The water taken by direct

---

[8] The applications originally filed by the Department of Finance were ultimately transferred to the Board. (See § 10504 ["All applications made and filed pursuant to Section 10500 shall be transferred to the State Water Resources Control Board and held by the board for the purposes of this part"].)

[9] All three lakes are ultimately tributary to the South Fork of the American River. Silver Lake lies in Amador County, Caples Lake lies in Alpine County, and Lake Aloha lies in El Dorado County. At the time, all three lakes were operated by PG&E (Pacific Gas & Electric Company) to generate hydroelectric power.

diversion was to be limited to water originating in the South Fork of the American River watershed upstream of the El Dorado Canal diversion near Kyburz (apparently, water originating in El Dorado County). The water was to be used for domestic, municipal, and irrigation purposes.

A hearing was held on El Dorado's applications and petition for assignment in June 1993 and again in October 1995. In August 1996, the Board issued its draft decision.[10] The Board determined that on an annual basis there appeared to be sufficient water available for El Dorado to appropriate. In previous decisions, however, the Board had already determined that based on flow records before and after 1927 there was no unappropriated water available for direct diversion or diversion to storage in the South Fork American River during the late summer and early fall months.[11]

The Board went on to note that El Dorado's petition for assignment of state-filed application No. 5645 sought "to appropriate water for purposes of use and a place of use that [are] consistent with . . . Application 5645." As the Board noted, "Fundamentally, Application 5645 was filed to assure a priority claim on the right to divert and use water from the South Fork American River to supply the future needs of El Dorado County and some adjoining areas." Accordingly, the Board determined that "subject to appropriate conditions to protect the counties o[f] origin,[12] public interest and the environment" El Dorado's petition for partial assignment of state-filed application No. 5645 to divert water to storage at the three lakes, to redivert water released from storage in the lakes at Folsom Reservoir, and to directly divert water from Folsom Reservoir should be approved.

The Board then went on to address whether term No. 91 should be included in El Dorado's permit. The Board explained that "[t]he purpose of the term is to protect persons claiming paramount rights to divert water from the Delta and the water quality upon which such rights depend and to protect fish and wildlife. . . . The effect of Term 91 is to reduce the months of each year during which a permit holder can divert water."

---

[10] The hearings, and the subsequent decision, also addressed various competing applications and petitions for assignment filed by other entities, which are not at issue here.

[11] In its draft decision, the Board asserted no water was available for appropriation "during the months of July through October"; in its final decision, however, the Board corrected this to the months of August through October.

Ultimately, in response to an argument made by the Bureau in a petition for reconsideration, the Board expressly determined that water was available for appropriation in July, "subject, of course, to water availability as determined by Term 91."

[12] The Board recognized that the water in Silver and Caples Lakes originates in Amador and Alpine Counties and therefore the partial assignment of application No. 5645 to El Dorado could be made only on the condition that El Dorado's appropriation of that water would be "subject to reduction by water projects that may be developed in these counties."

The Board noted it had previously included term No. 91 in permits issued to El Dorado in decision No. 1587, when it approved the assignment of various state-filed applications, including application No. 5645, to El Dorado in connection with the SOFAR project, but the Board claimed that decision No. 1587 did "not include an explanation for why the term was imposed." The Board continued: "Term 91 should apply to condition all new, junior, diversions of water when the satisfaction of inbasin entitlements requires that the CVP and SWP release supplemental project water. . . . [¶] . . . [S]tate filed Application 5645 is senior to many if not most of the permitted applications under which the Bureau and the Department operate the CVP and the SWP. Further, Water Code section 11128 provides that the watershed of origin protection shall apply to Bureau and Departmental operations of units of the CVP, as defined by the Water Code, irrespective of the priority of the permitted applications under which the projects are operated. Finally, at this time, it would be inequitable to apply Term 91 to Application 5645, because the Board has not imposed Term 91 on many permitted applications which are junior to Application 5645."

In comments on the draft decision, several parties—including the Department—objected to the Board's decision not to include term No. 91 in El Dorado's permit. The Board issued a revised draft decision in September 1996, but did not change its position regarding term No. 91. The Board did state, however, that it would reserve jurisdiction over the permit "via the language of standard condition 80, to change the season of diversion to conform to later findings of the Board concerning the availability of water and the protection of beneficial uses of water in the Sacramento-San Joaquin Delta and the San Francisco Bay."

In comments on the revised draft decision, the Department continued to object to the Board's decision not to include term No. 91 in El Dorado's permit. In addition, Westlands objected to this aspect of the Board's decision. Westlands urged the Board to "regulate all appropriators to prevent the diversion of water when unappropriated water is unavailable, regardless of whether Term 91 is included in any particular permit."

The Board issued its final decision—decision No. 1635—in October 1996. In that decision, without further explanation, the Board affirmed its earlier determination not to include term No. 91 in El Dorado's permit.

Various parties, including the Bureau, Westlands, and State Water Contractors, petitioned for reconsideration of decision No. 1635 on numerous grounds, including the Board's failure to include term No. 91 in El Dorado's

permit.[13] In November 1996, the Board granted the petitions, thereby deciding to reconsider whether it should include term No. 91 in El Dorado's permits.

Several years passed with no apparent action on the reconsideration of decision No. 1635. Meanwhile, in March 2000, the Board issued revised decision No. 1641 following the completion of phases Nos. 1 through 7 of the Bay-Delta water rights hearing—a water rights proceeding commenced to address the implementation of the water quality objectives for the Delta that the Board had adopted in 1995 in the water quality control plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary (the 1995 Bay-Delta Plan). In that decision, the Board assigned responsibility for meeting the flow-dependent objectives in the 1995 Bay-Delta Plan. With respect to various watersheds within the Delta watershed, the Board accepted the commitment of various water users to contribute specific amounts of water, with the Bureau and the Department ultimately responsible for ensuring the Delta water quality objectives were met. On an interim basis, the Board required the Bureau and the Department to meet all objectives that were not assigned to other parties. The Board expressed its intent to shortly commence phase No. 8 of the Bay-Delta water rights hearing "to determine the permanent allocations of responsibility with respect to the Sacramento River basin, the Cosumnes River, and the Calaveras River to meet the flow-dependent objectives." Permanent allocation of responsibility with respect to the San Joaquin River was to occur 12 years later, after the expiration of an agreement the Board had approved addressing the responsibility with respect to that river in the interim.

In April 2001, the Board issued order No. WR 2001-05, which addressed phase No. 8 of the Bay-Delta water rights hearing. Instead of resuming that phase of the hearing, the Board stayed resumption for 18 months, with phase No. 8 to be automatically dismissed at the end of that period unless either the Bureau or the Department insisted on resumption. The purpose of this action, which the Board took at the urging of the Bureau and the Department, among others, was "to facilitate negotiations that may lead to a settlement of the potential responsibilities of numerous water users to implement the objectives of the" 1995 Bay-Delta Plan. Essentially, the effect of the order was to impose on the Bureau and the Department "for an indefinite interim period" all of the responsibility of water users in the watersheds of the Sacramento, Calaveras, and Cosumnes Rivers for meeting the flow-dependent Delta water quality objectives.

---

[13] The Department also filed a petition for reconsideration challenging the Board's failure to include term No. 91, but that petition was not timely.

Two months later, in June 2001—over four and one-half years after the Board granted reconsideration of decision No. 1635—the Board issued a draft order on reconsideration in which it decided term No. 91 should be included in El Dorado's permit. Numerous parties, including El Dorado, filed comments on the draft order objecting to the Board's change of position.

In August 2001, the Board issued its order on reconsideration, order No. WR 2001-22. In that order, the Board agreed with those seeking reconsideration "that, notwithstanding the 1927 priority date of Application 5645, El Dorado should be required to curtail diversions when natural and abandoned flows in the Delta watershed are insufficient to meet water quality objectives in the San Francisco Bay and Sacramento-San Joaquin Delta Estuary and other inbasin uses." In response to El Dorado's claim "that it has a senior right to flows in the [South Fork of the American River] under area of origin protection laws, and that including Term 91 in its permit would negate its priority of right," the Board stated: "Term 91 only applies when the Projects are bypassing all natural and abandoned flows and are releasing stored water. When Term 91 is in effect, all natural and abandoned flows are needed for inbasin entitlements and water quality objectives. Thus, the seniority of El Dorado's right relative to the Projects is irrelevant. . . . A water right holder's seniority over the Projects does not allow diversions when the Projects are not diverting natural and abandoned flows and there is insufficient natural and abandoned flows for additional appropriations. Nor does seniority over the Projects entitle a water right holder to make use of stored water which the Projects diverted to storage when natural flows were sufficient to divert water under the Projects' priorities, either by taking that water from Project reservoirs or by requiring the Projects to release additional stored water to meet water quality objectives."

In addressing its previous "concern that it would be inequitable to include Term 91 in El Dorado's permit when the [Board] has not included Term 91 in many permits that are junior in priority to Application 5645," the Board recognized that in some term No. 91 conditions, "natural and abandoned flows may be insufficient to meet water quality objectives alone, or may be insufficient to meet water quality objectives, riparian rights and inbasin appropriative rights that have priorities senior to Application 5645. Under these conditions, there is no water available for appropriation. [Citations.] The authority of the [Board] to issue water right permits applies to unappropriated water. [Citation.] Equitable concerns cannot provide a basis for issuing a permit to appropriate water at times when no water is available for appropriation."

The Board also recognized that in some circumstances "natural and abandoned flows [may] exceed those necessary to satisfy water quality

objectives and all inbasin users who are senior to El Dorado, but are insufficient to satisfy all inbasin entitlements." Under those circumstances, appropriators with priorities junior to El Dorado but without term No. 91 in their permits would be able to divert the excess water while El Dorado would be prohibited from doing so. The Board decided, however, that "it is not clear based on the record in this proceeding how frequently those circumstances occur or whether there are equities that favor some of the junior basin users over El Dorado. The [Board] cannot impose Term 91 on junior inbasin users as part of this proceeding, and to the extent that it may be inequitable to restrict diversions by El Dorado at times when junior inbasin users continue their diversion because their permits do not include Term 91, it would be inequitable to shift that burden to the Projects."

Ultimately, the Board concluded "that Term 91 constitutes the best method presently available for determining when water is available for appropriation by El Dorado." The Board "reserve[d] jurisdiction to modify El Dorado's permit in light of subsequent findings regarding water availability." In a footnote, the Board noted that El Dorado could "participat[e] in any proceeding before the [Board] regarding implementation of water quality objectives for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary, and present[] evidence and legal or policy arguments in that proceeding regarding El Dorado's responsibility for meeting water quality objectives or applicability of Term 91 to El Dorado." Presumably this was a reference to phase No. 8 of the Bay-Delta water rights hearing, which at that time remained stayed at the request of the Bureau and the Department.

### The Current Litigation

Dissatisfied with the Board's decision, in September 2001 El Dorado Irrigation District filed a petition for writ of mandate and complaint for declaratory and injunctive relief in the Sacramento County Superior Court (case No. 01CS01319) claiming, among other things, that the Board's inclusion of term No. 91 deprived El Dorado "of the protections given to it under the area or watershed of origin statutes (Water Code section 11460 et seq.)" and "negate[d El Dorado's] priority water right given to it under state law." El Dorado County Water Agency filed a similar petition and complaint (case No. 01CS01321). In February 2002, the trial court consolidated the two cases with a third case challenging the Board's decision and assigned the consolidated cases to Judge Lloyd Connelly.[14]

In May 2002, the Board moved to dismiss the petitions filed by El Dorado to the extent they challenged the Board's decision regarding term No. 91

---

[14] The third case did not raise any issue relating to term No. 91, and no appeal has been taken on the issues raised in that case. Accordingly, we do not discuss that case further.

because El Dorado had not named any real parties in interest in its petitions and thereby had failed to join various parties whom the Board claimed were either indispensable or necessary. The court denied that motion. In doing so, the court found the Bureau, the Department, State Water Contractors, and Westlands were necessary, but not indispensable, parties and ordered El Dorado to join them. The court further ordered that in equity and good conscience the actions would be allowed to proceed even if those parties failed to appear or were dismissed from the actions based on valid sovereign immunity or statute of limitations defenses.

Subsequently, El Dorado filed amended petitions naming the Bureau, the Department, State Water Contractors, and Westlands as real parties in interest. The Bureau specially appeared to advise the court that it would not waive its sovereign immunity and participate in the action.

Meanwhile, in October 2002, the Board extended the stay and postponed the automatic dismissal of phase No. 8 of the Bay-Delta water rights hearing until January 2003. According to the Board, "[t]he Projects did not request resumption of phase eight on or before January 31, 2003, and phase eight was dismissed automatically." Accordingly, as of early 2003, the Bureau and the Department continued—albeit on an interim basis—to be ultimately responsible for meeting Delta water quality objectives, just as they had been since the adoption of decision No. 1485 in 1978. The Board has yet to make any final decision regarding the allocation of responsibility among the water users in the Delta watershed for meeting those objectives.

Eventually, in December 2003, the trial court issued its final ruling on El Dorado's petitions. The court determined that "when the Board included Term 91 in El Dorado's permit . . . , the Board contravened . . . critical statutory policies for the appropriation of water: a rule of priority set forth in Water Code section 10500 and area of origin protections set forth in Water Code sections 10505, 10505.5 and 11460–11[4]63. The Board incorrectly deemed these statutory priorities and protections to be irrelevant."

The trial court first explained that allowing "appropriators with priority dates junior to El Dorado's 1927 priority date . . . to continue their diversions under Term 91 conditions when El Dorado would be required to curtail its diversions" was "contrary to . . . the rule of priority under California water law, as modified by Water Code section 10500." Although "the Board has authority to modify the priorities of appropriative water rights to the extent necessary to assure the reasonable uses of state water resources in the public interest" and may "alter the rule of 'first in time, first in right' through permit conditions giving a higher priority to a preferred beneficial use occurring later in time," "the Board's authority to impose terms and conditions under Water

Code sections 1253 and 1257 cannot properly include authority to impose terms and conditions that effectively nullify legislative policies for state-filed applications." By determining "that the 1927 priority date was irrelevant to the operation of Term 91 and that equitable considerations may favor the junior rights," the Board "acted contrary to the policy of Water Code sections 10500 and 10504."

The trial court next explained that "the preference in Water Code sections 11460 and 11128 for El Dorado's use of water within the watershed of origin to meet El Dorado's increasing development needs was intended to trump the Projects' use of that water—including previously stored water—for project operations outside the watershed." Similarly, "the preference in Water Code sections 10505 and 10505.5 for El Dorado's use of water originating in El Dorado County to meet its development needs properly trumped out of county use of that water by parties holding permits for appropriation of the water that were issued pursuant to an assignment of a section 10500 state-filed application and that were not subject to Term 91."

Based on this reasoning, the court determined the Board had to set aside its decision to include term No. 91 in El Dorado's permit, although the Board could conduct further proceedings on El Dorado's petition to determine appropriate conditions relating to El Dorado's responsibility for Delta water quality. Any such conditions, however, could not "significantly deprive El Dorado of the statutorily mandated priorities and preferences."

The court entered judgment on December 23, 2003, ordering the issuance of a peremptory writ of mandate "requiring the . . . Board . . . to set aside the provisions of Order WR 2001-22 that include Term 91 in the permit issued" to El Dorado and "to conduct such proceedings as the Board, in its sound discretion, deems necessary to assure that the terms and conditions of the permit are consistent with Water Code sections 10500, 10505, 10505.5, 11460 and 11128."[15]

The Board, Westlands, and State Water Contractors filed timely notices of appeal from the judgment. El Dorado filed timely notices of cross-appeal. This court later granted a motion by the Department to participate as a cross-respondent in El Dorado's cross-appeals.

---

[15] The judgment denied another portion of the petition filed by El Dorado Irrigation District in which they sought to challenge a ruling in the Board's order on reconsideration requiring them to submit a report setting forth the legal basis of its claim to pre-1914 water rights. The El Dorado Irrigation District has not challenged that aspect of the judgment on appeal.

## DISCUSSION

### I

### *Standard Of Review*

"[I]n undertaking to allocate water rights, the Board performs an adjudicatory function." (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at p. 113.) Accordingly, Code of Civil Procedure section 1094.5 applies to a writ proceeding seeking to challenge a water rights decision by the Board. (§ 1126.) "The inquiry in such a case shall extend to the questions whether the [Board] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Board] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

"In a case[, like the present case,] wherein no limited trial de novo is authorized by law, . . . the trial court . . . exercises an essentially appellate function in that only errors of law appearing on the administrative record are subject to its cognizance. In such a case, . . . the trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error." (*Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915–916 [80 Cal.Rptr. 89, 458 P.2d 33].)

Of course, questions of law are subject to de novo review. (E.g., *Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404 [107 Cal.Rptr.2d 39].) The proper interpretation of a statute and its application to undisputed facts is a question of law. (*Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 357 [127 Cal.Rptr.2d 516, 58 P.3d 367].)

### II

### *Imposition of Term No. 91*

We begin with the Board's arguments as to "why the trial court erred by finding that Term 91 violates the principles of priority, [area] of origin and county of origin statutes."

The Board asserts it has broad discretion to grant a permit to appropriate water subject to "terms and conditions as in its judgment will best develop,

conserve, and utilize in the public interest the water sought to be appropriated." (§ 1253; see also *Bank of America v. State Water Resources Control Bd.* (1974) 42 Cal.App.3d 198, 212 [116 Cal.Rptr. 770].) The Board further asserts it has broad discretion to impose conditions on the assignment of a state-filed application. (See § 10504 ["The board may . . . assign any portion of any application" filed under the Feigenbaum Act].)

We do not disagree with either of these assertions. The question, however, is whether the Board abused this broad discretion by imposing term No. 91 on El Dorado's permit. More specifically, did the Board abuse its discretion (as the trial court concluded) because the imposition of term No. 91 on El Dorado's permit contravened the rule of priority, as well as the area of origin and county of origin statutes?

## A

### *The Rule of Priority*

We start with the rule of priority. "California operates under a 'dual' or hybrid system of water rights which recognizes both doctrines of riparian rights and appropriation rights. . . . The riparian doctrine confers upon the owner of land the right to divert the water flowing by his land for use upon his land, without regard to the extent of such use or priority in time. . . . [¶] . . . [T]he appropriation doctrine confers upon one who actually diverts and uses water the right to do so provided that the water is used for reasonable and beneficial uses and is surplus to that used by riparians or earlier appropriators. Appropriators need not own land contiguous to the watercourse, but appropriation rights are subordinate to riparian rights so that in times of shortage riparians are entitled to fulfill their needs before appropriators are entitled to any use of the water. [Citation.] And, as between appropriators, the rule of priority is 'first in time, first in right.' [Citation.] The senior appropriator is entitled to fulfill his needs before a junior appropriator is entitled to use any water." (*United States v. State Water Resources Control Bd., supra,* 182 Cal.App.3d at pp. 101–102.)

Over 60 years ago, our Supreme Court stated with respect to the Board's predecessor, the Department of Public Works, that "[i]t should be the *first* concern of the court in any case pending before it and of the department in the exercise of its powers . . . to recognize and protect the interests of those who have prior and paramount rights to the use of the waters of [a] stream." (*Meridian, Ltd. v. San Francisco* (1939) 13 Cal.2d 424, 450 [90 P.2d 537], italics added.) More recently, our Supreme Court stated that "water right priority has long been the *central* principle in California water law." (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1243 [99

Cal.Rptr.2d 294, 5 P.3d 853], italics added; see also Hutchins, The Cal. Law of Water Rights (1956) p. 130 ["Priority of right is the essence of the appropriation doctrine"].)

Of course, the rule of priority applies only to the use of natural or abandoned flows in a watercourse. No riparian or appropriator has a right to use water that was previously stored or imported by another upstream and then released into the watercourse for use downstream. (See §§ 1201 ["All water flowing in any natural channel, excepting so far as it has been or is being applied to useful and beneficial purposes upon, or in so far as it is or may be reasonably needed for useful and beneficial purposes upon lands riparian thereto, or otherwise appropriated, is hereby declared to be public water of the State and subject to appropriation in accordance with the provisions of this code"], 7075 ["Water which has been appropriated may be turned into the channel of another stream, mingled with its water, and then reclaimed"]; *Lindblom v. Round Valley Water Co.* (1918) 178 Cal. 450, 457 [173 P. 994].)

Furthermore, it is important to understand that priority of right is significant only when the natural or abandoned flows in a watercourse are insufficient to supply all demands being made on the watercourse at a particular time. Obviously, when flows are of sufficient abundance that every water user can fulfill his or her needs, the rule of priority does not matter.

As for the determination of an appropriator's priority over other appropriators, for appropriations since 1914 an appropriator's priority is generally fixed by the date of his or her application to appropriate the water. (See § 1450; Hutchins, The Cal. Law of Water Rights, *supra*, at pp. 94–95, 97, 116.) Section 10500 specifically confirms this application-date priority with respect to applications filed by the state under the Feigenbaum Act. (§ 10500 ["Applications filed pursuant to this part shall have priority, as of the date of filing, over any application made and filed subsequent thereto"].)

■ The rule of priority is of utmost importance to the Board's role in issuing appropriation permits because "[a]s prerequisite to the issuance of a permit to appropriate water . . . [¶] . . . [¶] (d) [t]here must be unappropriated water available to supply the applicant." (§ 1375, subd. (d); see also *United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at p. 102 [the decision of whether unappropriated water is available "requir[es] an examination of prior riparian and appropriative rights"].)

B

*The Effect of Term No. 91 on the Rule of Priority*

As previously explained, the trial court concluded the inclusion of term No. 91 in El Dorado's permit contravened "the rule of priority under California water law, as modified by Water Code section 10500" because "appropriators with priority dates junior to El Dorado's 1927 priority date would be able to continue their diversions under Term 91 conditions when El Dorado would be required to curtail its diversions." The Board contends, however, that the inclusion of term No. 91 in El Dorado's permit was a proper exercise of its discretion because "the vast majority of the time when Term 91 is in effect, no water is available for appropriation by either [El Dorado] or the junior appropriators." According to the Board, since most of the time there is no water available for El Dorado to appropriate when term No. 91 conditions exist, even taking into account its 1927 priority, El Dorado's priority over the junior appropriators who do not have term No. 91 in their permits or licenses is irrelevant.

To support its argument, the Board purports to show how term No. 91 would have operated if it had been applied to all major diverters in the Delta watershed under the hydrological conditions during the 73 years between 1922 and 1994. According to the Board's data, term No. 91 conditions would have existed in 5 Aprils, 15 Mays, 49 Junes, and 67 Julys. The Board then seeks to show how often El Dorado would have been required to curtail its diversions if term No. 91 had been applied by priority during that historical period—that is, if the major diverters in the Delta watershed had been "required to curtail their diversions in order of priority based on water availability." Dividing the various diverters into groups based on their priority dates,[16] the Board contends El Dorado's group would have been required to curtail its diversions in 2 Aprils, 4 Mays, 37 Junes, and 62 Julys. In the Board's view, this shows that "[t]he amount of time when Term 91 would have been in effect, but [El Dorado's group] would *not* have been curtailed ranges from just 4 to 16 percent. [Citation.] [¶] Put another way, 84 to 96 percent of the time, either Term 91 would not have been in effect, or no water would have been available for appropriation by" El Dorado. The Board also asserts that "[d]uring the periods when Term 91 would have been in effect, [El Dorado's group and all junior appropriators] would have been curtailed

---

[16] The priority groups on which the Board relies provide only a rough approximation of any particular diverter's exact priority. For example, El Dorado's priority date of July 30, 1927, is the most senior priority date in its group, which consists of applications filed between July 30, 1927, and June 25, 1930. Thus, under the Board's analysis, El Dorado would be required to curtail its diversions at the same time as an appropriator with a priority date nearly three years later.

approximately three quarters of the time."[17] Based on these figures, the Board contends that "Term 91 accurately reflects when water is available for appropriation under the 1927 priority of [El Dorado's] permit."

We cannot agree. First of all, in determining whether the inclusion of term No. 91 contravened El Dorado's priority, we are not concerned with those times when term No. 91 *would not have been in effect.* Obviously, term No. 91 cannot contravene El Dorado's priority when term No. 91 conditions do not exist and El Dorado is not prohibited from diverting by that term. As we have noted, priority of right is important only when the natural or abandoned flows in a watercourse are insufficient to supply all demands being made on the watercourse—i.e., during periods of water shortage, such as when term No. 91 is *in effect.* Accordingly, we limit our examination of the Board's data to those times.

As to those times, the Board contends term No. 91 accurately reflects water availability for El Dorado even taking into account its 1927 priority because 75 percent of the time during term No. 91 conditions there would have been no water available for El Dorado or any of the appropriators junior to El Dorado.[18] What this means, of course, is that 25 percent of the time when term No. 91 conditions existed between 1922 and 1994, there *would* have been water available for El Dorado to divert based on its 1927 priority. If El Dorado were always prohibited from diverting under term No. 91 conditions, and junior appropriators were not, then El Dorado's priority would have been violated 25 percent of the time because 25 percent of the time those junior appropriators would have been allowed to divert the available natural flow that should have gone to El Dorado first under the rule of priority.[19]

---

[17] This figure is calculated by dividing the total number of months in which El Dorado would have been required to curtail its diversions (105) by the total number of months in which term No. 91 conditions existed (136).

[18] We note that term No. 91 operates to estimate the availability of natural flow for diversion in the Delta watershed *as a whole,* rather than the availability of natural flow in the watershed of the South Fork of the American River in particular, which is where El Dorado is entitled to appropriate water. Under term No. 91, if the amount of water the projects are releasing from storage at Shasta Dam, Oroville Dam, and Folsom Dam, plus the amount of water being imported from the Trinity River, exceeds the amount of water the projects are exporting from the Delta plus carriage water, then the Board considers there to be no water available for appropriation by any term No. 91 permittee or licensee in the entire Delta watershed, regardless of the amount of natural flow at that time in any particular subordinate watershed within the greater Delta watershed.

[19] Although no one has identified exactly how many appropriators there are in the Delta watershed with priority dates junior to El Dorado who do not have term No. 91 in their permits or licenses, we note that the portion of the record the Board cites to support this argument shows what appear to be hundreds of water rights in the Central Valley with priority dates between 1927 and 1965. In the trial court, the Board's attorney agreed that the number of these junior appropriators "is in the neighborhood of hundreds."

As to the 75 percent of the time when the Board contends there would have been no water available for El Dorado or any of the junior appropriators to divert, term No. 91 may accurately reflect water availability—taking into account the need for water to meet water quality objectives in the Delta—but its inclusion in El Dorado's permit still contravenes the rule of priority. This is so because even under those conditions the junior appropriators would not have been prohibited from diverting by term No. 91 while El Dorado would have been. Of course, under the rule of priority, neither El Dorado nor any of the junior appropriators is entitled to divert water when all of the natural and abandoned flows otherwise available to them are required to fulfill the needs of downstream riparians and senior appropriators. Term No. 91 is not necessary to prohibit diversions under such circumstances because the rule of priority compels that result. There may be circumstances, however, in which there is sufficient natural flow to satisfy the needs of downstream riparians and senior appropriators, with some surplus, but Delta water quality objectives are still unmet. In such circumstances, there is natural flow available for appropriation under the rule of priority, so the inclusion of term No. 91 in El Dorado's permit ostensibly serves the purpose of preserving the surplus natural flow to assist in meeting water quality objectives in the Delta. The problem is that, without term No. 91 in their permits or licenses, appropriators junior to El Dorado can divert this surplus water. Thus, the natural flow El Dorado is required to bypass under term No. 91 may never actually reach the Delta. In this circumstance also, the priority of El Dorado's water right is contravened.

■ Of course, the rule of priority is not absolute, nor is the Board without power to act contrary to that rule in appropriate circumstances. Sometimes, a competing principle or interest may justify the Board's taking action inconsistent with a strict application of the rule of priority.

For example, the California Constitution provides that all water use must be reasonable.[20] (Cal. Const., art. X, § 2.) "[T]he rule of reasonable use as enjoined by . . . the Constitution applies to all water rights enjoyed or

---

[20] "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be

asserted in this state . . . ." (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 383 [40 P.2d 486].) Thus, "no one can have a protectible interest in the unreasonable use of water" (*City of Barstow v. Mojave Water Agency*, *supra*, 23 Cal.4th at p. 1242), and when the rule of priority clashes with the rule against unreasonable use of water, the latter must prevail. Every effort, however, must be made to respect and enforce the rule of priority. A solution to a dispute over water rights "*must* preserve water right priorities to the extent those priorities do not lead to unreasonable use." (*Id.* at p. 1243, italics added.)

█  Another important principle that may compete with the rule of priority is the public trust doctrine. That doctrine recognizes that "the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people." ' " (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434 [189 Cal.Rptr. 346, 658 P.2d 709].) Ecological values are among those values protected by the public trust. (*Id.* at p. 435.) "The state has an affirmative duty to take the public trust into account in the planning and allocation of water resources, and to protect public trust uses whenever feasible." (*Id.* at p. 446.) Indeed, this duty "prevents any party from acquiring a vested right to appropriate water in a manner harmful to the interests protected by the public trust." (*Id.* at p. 445.) Thus, like the rule against unreasonable use, when the public trust doctrine clashes with the rule of priority, the rule of priority must yield. Again, however, every effort must be made to preserve water right priorities to the extent those priorities do not lead to violation of the public trust doctrine.

█  The rule against unreasonable use and the public trust doctrine are not the only competing rules that may justify a deviation from the strict application of water right priorities. Section 106 declares it "to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the next highest use is for irrigation." In *East Bay M. U. Dist. v. Dept. of P. Wks.* (1934) 1 Cal.2d 476 [35 P.2d 1027], the Board's predecessor relied on this declaration of policy to justify imposing a condition on a permit issued for the use and storage of water for power purposes that prohibited " 'interfere[nce] with future appropriations of said water for agricultural or municipal purposes.' " (*Id.* at p. 477.) Thus, the senior use for power purposes was subject to later curtailment in favor of junior domestic and agricultural uses.

---

construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled.

"This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." (Cal. Const., art. X, § 2.)

Here, the question is whether any competing principle or interest justifies the subversion of the rule of priority that results from the imposition of term No. 91 on El Dorado but not on various junior appropriators. The Board suggests the competing interest can be found in the need to protect water quality in the Delta. More specifically, the Board contends that "to prevent the unreasonable use of water, [it] has the authority to impose conditions in water right permits to assist in implementing water quality objectives." The Board further contends that its power to take actions to improve water quality is reinforced by the public trust doctrine. Essentially, the Board argues that the inclusion of term No. 91 in El Dorado's permit—and the corresponding subversion of El Dorado's priority—was justified by the Board's interest in protecting water quality in the Delta, which is supported by the rule against unreasonable use and the public trust doctrine.

We do not dispute that sometimes the use of water under a claim of prior right must yield to the need to preserve water quality to protect public trust interests, and continued use under those circumstances may be deemed unreasonable. Thus, to the extent El Dorado's diversions of natural flow contribute to the degradation of water quality in the Delta, the Board has a legitimate interest in requiring El Dorado to reduce its diversions to contribute toward the maintenance and improvement of water quality in the Delta. At the same time, however, when the Board seeks to ensure that water quality objectives are met in order to enforce the rule against unreasonable use and the public trust doctrine, the Board must attempt to preserve water right priorities to the extent those priorities do not lead to unreasonable use or violation of public trust values. In other words, in such circumstances the subversion of a water right priority is justified only if enforcing that priority will in fact lead to the unreasonable use of water or result in harm to values protected by the public trust.[21]

The Board has not shown that will be the result here if term No. 91 is omitted from El Dorado's permit. If El Dorado is allowed to divert when the projects are releasing stored water to meet Delta water quality objectives, the objectives will not go unmet. Instead, the projects will simply have to release more stored water to meet the objectives, because the Board has imposed the ultimate obligation for meeting the objectives on the projects (albeit on an interim basis). Because the objectives will be met in any event, the imposition of term No. 91 on El Dorado cannot be justified as necessary to ensure the reasonable use of water or to protect public trust interests. Instead, term

---

[21] This is not to say that in seeking to ensure water quality objectives are met, the Board must strictly adhere to priorities and impose the obligation to meet those objectives on junior appropriators before imposing *any* of that obligation on senior appropriators. The Board undoubtedly has the power to allocate the burden of meeting water quality objectives based on more than priorities alone. At the same time, however, the Board cannot disregard priorities without substantial justification. As will be seen, we find no such justification here.

No. 91 simply functions to protect the projects by relieving them of some of the responsibility for meeting Delta water quality objectives that otherwise would fall on them. More specifically, term No. 91 serves to protect the projects' stored water and the right of the projects to export that water elsewhere, rather than using it to meet Delta water quality objectives.

Arguably, the Board's interest in protecting the projects' stored water is justified as an effort to enforce the rule (which we have noted already) that no appropriator has a right to take water that was previously stored or imported by another upstream and then released into the watercourse for use downstream. To this end, the Board suggests that if term No. 91 is not included in El Dorado's permit and El Dorado is allowed to divert water when natural flows are insufficient, then El Dorado will be allowed to take—if not actually, then at least constructively—the stored water that belongs to the projects, in contravention of this rule.

We do not agree that the Board's interest in enforcing the rule against the taking of water stored by others justifies the subversion of the rule of priority in this case. First of all, according to the Board's data, 25 percent of the time when term No. 91 conditions would have been in effect there would have been natural flow available for El Dorado to divert according to its priority. Certainly under those circumstances, continued diversion by El Dorado would not have resulted in the taking of the projects' stored water, either actually or constructively, because what El Dorado would have been diverting was the natural flow to which it was entitled. If any taking of the projects' stored water would have occurred, it would have occurred because appropriators *junior* to El Dorado were allowed to continue diverting when there was no natural flow available to them according to *their* priorities.

As for the remaining 75 percent of the time, we have noted already that under the rule of priority neither El Dorado nor any of the junior appropriators is entitled to divert water when all of the natural and abandoned flows otherwise available to them are required to fulfill the needs of downstream riparians and senior appropriators. Omitting term No. 91 from El Dorado's permit does not give El Dorado the right to take water when no natural or abandoned flows are available according to the priority of that permit. Thus, term No. 91 is not necessary in such circumstances to protect against the actual or constructive taking of the projects' stored water.

We do acknowledge that there may be circumstances in which El Dorado is authorized to continue diverting under the rule of priority, but if El Dorado does so there will be insufficient flow to meet Delta water quality objectives. This may happen because although El Dorado is bound by the rule of priority to bypass natural flow when it is needed by downstream riparians and senior

appropriators, El Dorado is under no obligation (absent some action by the Board) to bypass natural flow that is needed to meet Delta water quality objectives. Thus, there may be times when the natural flow is sufficient to allow El Dorado to divert *and* to meet the needs of downstream riparians and senior appropriators, but not sufficient to also satisfy Delta water quality objectives. In those circumstances, El Dorado's diversion of the natural flow available under the rule of priority will require the projects to release more stored water to satisfy the water quality objectives.

Even in those circumstances, however, El Dorado cannot be deemed to have taken the projects' stored water. What El Dorado is taking is natural flow to which it has a right under the rule of priority, while the projects are required to release stored water to meet Delta water quality objectives under the compulsion of prior Board decisions. Thus, the rule against the taking of water stored by others is not implicated here, and the Board's interest in protecting the projects' stored water for export does not trump the rule of priority.

Of course, as we have noted already, the Board has a legitimate interest in requiring El Dorado to contribute toward the maintenance of Delta water quality objectives to the extent El Dorado's diversion of natural flow contributes to the degradation of water quality in the Delta. The Board is under no obligation to require the projects to bear all of the burden of meeting water quality objectives in the Delta indefinitely. The ultimate question, however, is whether the Board's interest in securing El Dorado's contribution toward meeting those objectives—which will be met by the projects even if El Dorado does not contribute—is of such importance that to accomplish that goal, the Board was justified in subverting the priority of El Dorado's water right.

It is important to remember that the Board's inclusion of term No. 91 in El Dorado's permit, by itself, did not subvert the rule of priority. The subversion occurred because the Board has not included a similar restriction in the permits or licenses of appropriators within the Delta watershed with priorities junior to El Dorado's. Thus, in determining whether the Board was justified in subverting the rule of priority here, we must examine the Board's reason for not taking similar action on the water rights of junior appropriators.

In its order on reconsideration, the Board tersely explained that it could not "impose Term 91 on junior inbasin users as part of this proceeding." That may have been technically true, because those junior appropriators presumably were not notified their rights might be affected by the proceeding. At all times, however, the Board presumably had the power to add those junior appropriators as parties to the proceeding. At the very least, the Board had the

power to convene a proceeding that would encompass all of those junior appropriators without term No. 91 in their permits or licenses and that would address their obligation to contribute toward Delta water quality along with El Dorado's obligation. Indeed, that was the very purpose of the Bay-Delta water rights hearing—to allocate responsibility for meeting Delta water quality objectives among the various water users throughout the Delta watershed. Unfortunately, at the urging of the Bureau and the Department, the Board stayed and then dismissed the final phase of that hearing without actually determining, on a permanent basis, how that responsibility should be allocated.

Having forgone the opportunity to address the responsibility of the junior appropriators for meeting Delta water quality objectives along with the responsibility of El Dorado, was the Board justified in visiting responsibility on El Dorado alone, in contravention of the rule of priority? No. Keeping in mind the fundamental importance of that rule, the Board has not shown that its interest in requiring El Dorado to contribute otherwise available natural flow toward Delta water quality objectives justifies the subversion of the rule of priority, which has occurred here only because the Board has elected not to proceed against the junior appropriators who are not bound by term No. 91.

It is important to note that the Board's failure to ensure similar restrictions are imposed on junior appropriators in the Delta watershed will only make it more likely that natural flow that El Dorado bypasses to assist in meeting Delta water quality objectives will never actually serve that purpose. This is so because the junior appropriators, bound only by the rule of priority, will be entitled to divert water El Dorado has bypassed if that water is in excess of the needs of downstream riparians and senior appropriators, even if that water is otherwise needed for water quality purposes in the Delta. Thus, El Dorado is deprived of water to which it is entitled under the rule of priority, but that water never actually serves the purpose for which it was taken from El Dorado in the first place. And this occurs only because the Board has chosen not to include the junior appropriators in this proceeding or to finish the Bay-Delta water rights hearing.

Contrary to the Board's belief, the choice whether to impose term No. 91 on El Dorado given that other junior appropriators are not bound by that term was not simply a matter of choosing whether to impose an "inequity" on El Dorado (requiring El Dorado to forgo diversions when other junior appropriators can continue diverting) or an "inequity" on the projects (requiring them to release more stored water). The Board's role was not simply to determine which choice it thought was the most "fair," untethered from any guiding principles. On the contrary, in making that choice the Board's *"first concern"* should have been to recognize and protect El Dorado's prior

appropriate right, if possible. (*Meridian, Ltd. v. San Francisco, supra*, 13 Cal.2d at p. 450, italics added.) If it could not impose term No. 91 without contravening El Dorado's 1927 priority, then it should not have imposed that term at all, because no competing principle or interest justified that result.

Westlands argues the inclusion of term No. 91 in El Dorado's permit did not violate the rule of priority because that conclusion "assumes . . . the Board granted El Dorado an unconditional 1927 priority," which it then violated by including term No. 91 on El Dorado's permit. According to Westlands, what the Board did was assign the state-filed application to El Dorado subject to various terms and conditions, including term No. 91, and in assigning the application to El Dorado subject to term No. 91 the Board effectively gave El Dorado "a 1927 priority, except during times of Term 91 conditions, when they are treated the same as a permittee with a 1965 or later priority."

We do not dispute the Board's authority to impose appropriate conditions on the assignment of a state-filed application. However, the imposition of term No. 91 on El Dorado, but not on other junior appropriators, cannot be justified under that authority.

Section 10500 provides that state-filed applications "*shall* have priority, as of the date of filing, over any application made and filed subsequent thereto." (Italics added.) In fact, the only benefit to be derived from the assignment of a state-filed application is the priority of the application over later applications.

We have explained already that priority of right is important only when there is not enough water to go around. Assigning a state-filed application for the purpose of giving the assignee the benefit of the application's priority, and at the same time imposing a condition on the assignment that would deny the assignee the benefit of the priority in periods of water shortage, would effectively defeat the very purpose for which the application was assigned in the first place. It would be akin to selling a person a life insurance policy that terminates on the policyholder's death—a meaningless act.

In its effort to protect the projects' stored water and to require El Dorado to contribute toward Delta water quality objectives, the Board cannot deprive El Dorado of the priority that was the only purpose of assigning El Dorado a state-filed application, at least not without some compelling reason based on a principle or interest that trumps the rule of priority. No such principle or interest has been identified here.

State Water Contractors argues that removing term No. 91 from El Dorado's permit would violate section 10504, the statute that allowed the

Board to assign the state-filed application to El Dorado. Section 10504 gives the Board the discretion to assign any portion of a state-filed application when the assignment "is for the purpose of development not in conflict with [the State Water Plan] or with water quality objectives established pursuant to law." State Water Contractors contends that because the trial court upheld the Board's finding "that El Dorado's appropriations would have . . . cumulatively adverse impacts on Delta water quality," the trial court necessarily "found a conflict between El Dorado's proposed diversion and existing water quality objectives." State Water Contractors contends term No. 91 was "intended to prevent" this conflict and therefore cannot be removed from El Dorado's permit without violating section 10504.

We are not persuaded. As the trial court pointed out in decision No. 1645, the Board expressly found that assignment of the state-filed application to El Dorado would not conflict with water quality objectives because the Department and the Bureau are required to operate the projects to assure that Delta water quality objectives are met. Thus, while El Dorado's diversion of water may reduce the amount of natural flow that would otherwise contribute to meeting Delta water quality objectives, those objectives will still be met and therefore there is no conflict between the assignment and the objectives, even without term No. 91 in the permit.

State Water Contractors contends that if the projects are required to release stored water to compensate for El Dorado's diversions, then section 10504 will still be violated because El Dorado's diversion will "conflict with the state's general, coordinated plan of water development." The Board, however, expressly found that the assignment of the state-filed application to El Dorado "cannot be in conflict with the State Water Plan" because "the authors of the California Water Plan intended that the plan be no more than a general planning document and that more feasible plans would have to be developed at a later date." State Water Contractors simply ignores this finding. Furthermore, it is significant to note the Board's own observation that "Application 5645 was filed to assure a priority claim on the right to divert and use water from the South Fork of the American River to supply the future needs of El Dorado County and some adjoining areas." State Water Contractors has not shown that the amorphous State Water Plan somehow gives preference to protecting the projects' stored water for export over the paramount interest in enforcing the priority of the state-filed application assigned to El Dorado.

In summary, we agree with the trial court that the Board abused its discretion when it included term No. 91 in El Dorado's permit without including that term in the licenses and permits of junior appropriators, because the imposition of term No. 91 in these circumstances subverted the rule of priority without adequate justification.

Although this conclusion justifies affirming the trial court's judgment, we go on to address the trial court's conclusions regarding the county of origin and area of origin statutes for two reasons—first, to provide guidance to the Board on remand, because the writ the trial court issued allows the Board "to conduct such proceedings as the Board, in its sound discretion, deems necessary to assure that the terms and conditions of the permit are consistent with Water Code sections 10500, 10505, 10505.5, 11460 and 11128"; and second, because State Water Contractors contends the area of origin statutes require the inclusion of term No. 91 in El Dorado's permit.

## C

### The County of Origin Statutes

Section 10505 provides that "[n]o priority under this part shall be released nor assignment made of any application that will, in the judgment of the board, deprive the county in which the water covered by the application originates of any such water necessary for the development of the county." Section 10505.5 provides that "[e]very application heretofore or hereafter made and filed pursuant to Section 10500, and held by the State Water Resources Control Board, shall be amended to provide, and any permit hereafter issued pursuant to such an application, and any license issued pursuant to such a permit, shall provide, that the application, permit, or license shall not authorize the use of any water outside of the county of origin which is necessary for the development of the county."

The trial court concluded that "the preference in Water Code sections 10505 and 10505.5 for El Dorado's use of water originating in El Dorado County to meet its development needs properly trumped out of county use of that water by parties holding permits for appropriation of the water that were issued pursuant an assignment of a section 10500 state-filed application and that were not subject to Term 91."

It is important to note that in concluding the imposition of term No. 91 on El Dorado's permit contravened the county of origin protections in sections 10505 and 10505.5, the trial court did not find a conflict between El Dorado and the projects. Instead, what the trial court found was a conflict between El Dorado and junior appropriators with state-filed applications who were not subject to term No. 91 and who would be using, outside of El Dorado County, water originating in El Dorado County that El Dorado would otherwise have the right to divert but for term No. 91. In essence, the trial court concluded that by requiring El Dorado to curtail its diversion of water originating in the county, but allowing junior appropriators outside the county

with state-filed applications to divert that same water, the Board contravened the county of origin protections in sections 10505 and 10505.5.

We need not determine whether the trial court was correct in its construction of the county of origin statutes because the record lacks any evidence that there *are* any junior appropriators with state-filed applications who do not have term No. 91 in their permits or licenses and who are downstream from El Dorado and therefore in a position to divert water originating in El Dorado County that El Dorado is required to bypass by term No. 91. Absent a factual basis for its determination, the trial court erred in finding the Board's action violated the county of origin statutes.

D

*The Area of Origin Statutes*

Section 11460 provides that "[i]n the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein." Section 11128 provides that section 11460 applies to the Bureau in its operation of the CVP, as well as to the Department in its operation of the SWP.[22] Section 11462 provides that "[t]he provisions of this article shall not be so construed as to create any new property rights other than against the department as provided in this part or to require the department to furnish to any person without adequate compensation therefor any water made available by the construction of any works by the department."

The trial court concluded that "the preference in Water Code sections 11460 and 11128 for El Dorado's use of water within the watershed of origin to meet El Dorado's increasing development needs was intended to trump the Projects' use of that water—including previously stored water—for project operations outside the watershed." Essentially, the trial court found the imposition of term No. 91 on El Dorado contravened the area of origin protections to the extent that term protects the projects' exports at the

---

[22] "The limitations prescribed in Section 11460 and 11463 shall also apply to any agency of the State or Federal Government which shall undertake the construction or operation of the project, or any unit thereof, including, besides those specifically described, additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part." (§ 11128.)

expense of El Dorado's diversion of water originating in the watershed of the South Fork of the American River.

The Board and Westlands argue that term No. 91 does not violate the area of origin protections because "[w]hen Term 91 is in effect, . . . the Projects are not appropriating any natural or abandoned flows for purposes of export." In other words, they contend the area of origin protections merely give priority to appropriators within the area of origin at the time natural flow is being diverted.[23] Thus, when natural flow in the South Fork of the American River is available for diversion, El Dorado is entitled to divert that water for use within the area of origin before the Bureau or the Department is entitled to divert that water for export outside the area of origin (e.g., to the San Joaquin Valley). In their view, however, once the Bureau and the Department have properly diverted water to storage, El Dorado cannot assert any superior right to that stored water under the area of origin statutes, as the trial court concluded it could.

In addressing this aspect of the trial court's decision, it is important to remember that the question here is not whether the Bureau and the Department are operating the projects in conformance with the area of origin statutes but whether the Board abused its discretion when it imposed term No. 91 on El Dorado's permit. This is an important distinction because of the language of the area of origin statutes. Read in conjunction with section 11128, section 11460 operates as a prohibition on the Bureau and the Department in the construction and operation of the projects. On its face at least, the statute does not purport to limit the Board's power in administering water rights. This reading of the statute is bolstered by section 11461, which provides that "the provisions of this article shall be strictly limited to the acts and proceedings of the department, as such, and shall not apply to any persons or state agencies." Significantly, the trial court did not address section 11461.

Although section 11460 does not directly apply to the Board in its role as an administrator of water rights, this does not mean the statute is altogether inapplicable to the Board. If the Board were to impose a term or condition in a permit that *required* the Bureau or the Department to operate the projects in violation of section 11460, we have little doubt that an interested party could seek relief from that term or condition on the ground that the Board had not proceeded in the manner required by law. Where, as here, however, the Board is not even acting on any of the projects' permits, and instead is acting on a permit issued to another party, it is questionable whether the Board's action

---

[23] Like the parties, we will use the term "area of origin" in place of the more cumbersome phrase—"a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom"—used in section 11460.

on that permit could be deemed to violate statutory protections that are expressly limited to the acts and proceedings of the Bureau or the Department.

■ In any event, even if the area of origin statutes could otherwise be deemed to apply to the Board in this instance, section 11462 contradicts the trial court's conclusion that appropriators in an area of origin may assert a priority to water from that area that was properly stored by another in an earlier season. That statute provides that the area of origin statutes do not "require the department to furnish to any person without adequate compensation therefor any water made available by the construction of any works by the department."

This provision reveals that the Legislature did not intend to give users within an area of origin the right to water stored by the Department without paying for it. Since the burden of the area of origin provision in section 11460 falls as much on the Bureau as it does on the Department, there is no reason to believe the Legislature did not intend the Bureau to equally benefit from the provisions of section 11462. In other words, although El Dorado may be entitled to assert a priority under section 11460 over the Bureau and the Department to the diversion of water originating in the watershed of the South Fork of the American River, that priority does *not* extend to water the projects have properly diverted to storage at an earlier date. If El Dorado wants water properly stored by the projects, it must pay for it.

State Water Contractors contends "Term 91 is the mechanism that the . . . Board properly used to implement" the requirement of section 11462 that El Dorado pay for the use of any water stored by the projects, and removing term No. 91 from El Dorado's permit will actually violate that statute. We disagree. As we have explained already, omitting term No. 91 from El Dorado's permit will not allow El Dorado to take water stored by the projects, with or without compensation. If El Dorado is entitled to take any water at all, it is natural flow to which El Dorado is entitled under the 1927 priority of its permit, nothing more.

■ In summary, we conclude that although the county of origin and area of origin statutes did not justify the trial court's decision, the rule of priority did. The Board abused its discretion in imposing term No. 91 on El Dorado's permit issued on a stated-filed application with a priority date of 1927, when, without sufficient justification, the Board has chosen not to impose term No. 91 on the permits and licenses of what may be hundreds of junior appropriators in the Delta watershed with priority dates between 1927 and 1965.

## III

*Standing to Challenge Necessary Parties Ruling*

In its cross-appeals, El Dorado contends the trial court erred when it determined the Bureau, the Department, Westlands, and State Water Contractors were necessary parties to this litigation. Westlands contends El Dorado lacks standing to raise this issue on appeal because El Dorado is not an aggrieved party. Westlands and the Board further contend that even if the court's ruling was erroneous, El Dorado was not prejudiced by the error. In addition, the Board, the Department, Westlands, and State Water Contractors all contend the ruling was not error.

Westlands's first contention is correct. Because El Dorado cannot claim to be aggrieved by the trial court's judgment in its favor, El Dorado lacks standing to appeal from that judgment and therefore cannot challenge the court's necessary party ruling in an appeal from that judgment.

In a mandamus proceeding, just as in a civil action, "[a]ny party aggrieved may appeal" from the final judgment. (Code Civ. Proc., § 902; see also §§ 904.1, subd. (a)(1), 1109.) "One is considered 'aggrieved' whose rights or interests are injuriously affected *by the judgment.*" (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953], italics added.) Conversely, "A party who is not aggrieved by an order or judgment has no standing to attack it on appeal." (*Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, 244 [116 Cal.Rptr. 733].)

Here, El Dorado has appealed from a judgment that *granted* El Dorado's petition for a writ of mandate ordering the Board to remove term No. 91 from El Dorado's permit.[24] El Dorado cannot claim to be injured by a judgment in its favor.

It does not matter whether El Dorado's rights or interests were injured by the trial court's interlocutory ruling that the Bureau, the Department, Westlands, and State Water Contractors were necessary parties and the court's order that El Dorado join those parties.[25] So long as El Dorado was not

---

[24] As we have previously noted, the judgment also denied a separate aspect of El Dorado Irrigation District's mandamus petition aimed at a different aspect of the Board's ruling. The El Dorado Irrigation District, however, has not raised any issue on appeal regarding that aspect of the judgment.

[25] El Dorado contends that as a result of this ruling, it faced "[t]he additional expense and risk of an adverse judgment associated with defending against multiple filings from multiple parties." Of course, this risk did not come to fruition, as the trial court granted El Dorado the relief it sought from term No. 91.

injured by the final judgment, El Dorado cannot seek to challenge an adverse interlocutory ruling by appealing from that judgment. If El Dorado wanted to challenge the trial court's determination that the Bureau, the Department, Westlands, and State Water Contractors were necessary parties, it could have sought writ review from this court at the time the ruling was made. Having failed to do so and having now prevailed in the action, El Dorado has no standing to appeal.[26]

## DISPOSITION

El Dorado's cross-appeals are dismissed. The Board, the Department, Westlands, and State Water Contractors shall recover their costs relating to those cross-appeals.

The judgment is affirmed. El Dorado shall recover its costs relating to the appeals of the Board, Westlands, and State Water Contractors. (Cal. Rules of Court, rule 27(a)(1), (4).)

**SIMS, J.,** Concurring.—I concur in Justice Robie's opinion.

When I first reviewed this case, I thought that the equities were clearly with the board: After all, why *couldn't* the board assign the state's water rights subject to a condition that would preserve water quality of the Delta? What public purpose is served by upholding El Dorado's technical claim based on priority?

But, upon reflection, I do not think the equities are with the board.

The board has never denied that application No. 5645 would give El Dorado a 1927 priority date. Rather, the board found, "the seniority of El Dorado's right . . . is irrelevant . . . ." As Justice Robie's opinion makes clear, this conclusion was wrong.

There was a way for the board to deal in a straightforward way with El Dorado's 1927 priority. Water Code section 10504 provides in pertinent part, "The board may release from priority . . . any application filed under this part

---

[26] The Board, Westlands, and various amici curiae have requested that we take judicial notice of various documents in support of various of their arguments. Having found none of those documents relevant to our decision, we deny those requests.

when the release . . . is for the purpose of development not in conflict with such general or coordinated plan or with water quality objectives established pursuant to law."[1]

The board has not released El Dorado's 1927 priority. In my view, this statute would allow the board to release El Dorado's 1927 priority to ensure that El Dorado would contribute to water quality in the Delta. Except for one thing—section 10505, which provides: "No priority under this part shall be released nor assignment made of any application that will, in the judgment of the board, deprive the county in which the water covered by the application originates of any such water necessary for the development of the county."

By refusing to release El Dorado's priority, pursuant to section 10504, the board avoided the possible application of section 10505. But, in my view, this is how the board should have proceeded. Sections 10504 and 10505 set out the public policy of the state with respect to when priority of water rights may be avoided by the board. El Dorado was entitled to a determination whether the release of its priority would offend the county-of-origin rights conferred by section 10505.

I think the board went about this in the wrong way.

**BLEASE, Acting P. J.,** Concurring and Dissenting.—I concur in the judgment and in the opinion except that I dissent from the reasons given in support of parts IIA and IIB of the Discussion.

This case arises on the review of the quasi-adjudicatory action of the State Water Resources Control Board (the Board) that imposed a condition on permits issued to the El Dorado Irrigation District and the El Dorado County Water Agency (jointly El Dorado). The condition, standard term No. 91, requires El Dorado to curtail its diversion of water from the American River and Folsom Dam when the United States Bureau of Reclamation (the Bureau) or the Department of Water Resources (the Department) is releasing stored water from the Central Valley Project (CVP) or the State Water Project (SWP) (jointly the projects) to meet water quality objectives in the Sacramento-San Joaquin Delta (Delta) for salinity control and the protection of fish and wildlife.

The trial court ruled in favor of El Dorado. An appeal was taken by the Board, Westlands Water District (Westlands) and State Water Contractors

---

[1] Undesignated statutory references are to the Water Code.

(parties which contract with the CVP for water),[1] but not by the Department.[2] The Bureau did not make an appearance.[3]

El Dorado is the beneficiary of an assignment by the state of 1927 priority rights to appropriate water from the South Fork of the American River for consumptive use within El Dorado County. (Wat. Code, § 10504.)[4] That is the predicate for the lead opinion's claim that term No. 91 violates El Dorado's priority rights because it has *not* been placed in the permits of junior appropriators within the Delta so as to require them to share in meeting water quality objectives in the Delta. I disagree.

The priority doctrine does not apply. It involves the resolution of conflicting claims to appropriate the *same* water. (Civ. Code, § 1414.) However, none of the junior appropriators appeared in the proceeding below, the Board did not adjudicate claims to water involving them, it is speculative whether any of them would benefit by the use of water bypassed by El Dorado pursuant to term No. 91 and some are in basins that are not downstream of El Dorado and could not use water bypassed by El Dorado pursuant to the condition.

The lead opinion perceives a "fundamental principle[]" in the priority doctrine from which it fashions a common law rule requiring that appropriators share in providing water to meet the water quality objectives of the Delta including the prevention of saltwater intrusion. (Lead opn. *ante*, at p. 943.) There is no such common law rule. Under the common law, the priority doctrine does not extend to the prevention of saltwater intrusion in the Delta. (*Antioch v. Williams Irrigation Dist.* (1922) 188 Cal. 451, 465 [205 P. 688].)

The Board's authority to prevent saltwater intrusion and protect water quality in the Delta does not derive from the priority doctrine. It derives from the quasi-legislative authority delegated to the Board by the Porter-Cologne Water Quality Control Act (Porter-Cologne Act; § 13000 et seq.). (See *United*

---

[1] Although the contractors have contractual rights with the Bureau, they have no water rights of their own. (See *United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 145 [227 Cal.Rptr. 161] *(United States v. Board)*.)

[2] The Department appears as a real party in interest and respondent in El Dorado's appeal of an interlocutory order that joined Westlands, State Water Contractors and the Bureau as necessary parties. The Department also appears as amicus curiae in support of the Board. The Bureau asserted its sovereign right not to appear.

[3] Apparently for these reasons there is no party on appeal that has asserted the 1927 priority water rights of the state and federal governments and no such claim is advanced or considered in the lead opinion. The lead opinion suggests that the real conflict is between El Dorado and the projects for it says that "[i]f El Dorado is allowed to divert . . . the projects will simply have to release more stored water to meet the [water quality] objectives . . . ." (Lead opn., *ante*, at p. 967.) That is incorrect for reasons I advance in the text.

[4] A reference to a section is to the Water Code unless otherwise designated.

*States v. Board, supra,* 182 Cal.App.3d 82.) The authority is implemented by the Board's adoption of a water quality control plan (§§ 13140–13147) and is enforced by the placement of conditions in the permits of those who appropriate water that otherwise would flow through the Delta (§ 1258; see also § 10504). In adopting a water quality control plan the Board is directed to "consider . . . *all* competing demands for water" in determining what is a reasonable level of water quality protection for the Delta. (*United States v. Board, supra,* 182 Cal.App.3d at p. 118; see § 13000.)

The Board sought to implement the Porter-Cologne Act by the adoption of a Water Quality Control Plan for the Sacramento-San Joaquin Delta and Suisun Marsh (Delta Plan). However, the Delta Plan does not encompass all competing demands for water. As pertinent here it does not apply to appropriators upstream of the projects and hence does not apply to El Dorado.[5] (*United States v. Board, supra,* 182 Cal.App.3d at p. 118.)

Although I agree with the policy implicit in the lead opinion's priority doctrine, the policy cannot be derived from the priority doctrine. The Board lacks the statutory authority to place a term No. 91 condition in the El Dorado permit until it exercises its quasi-legislative authority to extend the Delta Plan to appropriators upstream of the projects, as required by *United States v. Board, supra,* 182 Cal.App.3d 82. It cannot independently impose such a condition under its general authority to establish the beneficial uses of water for the Delta. (§ 1253.)

I

The Priority Doctrine

The lead opinion is premised on the claim that El Dorado's superior 1927 priority date precludes the Board from imposing term No. 91 on permits to appropriate water from the American River when it has not imposed the term on appropriators in the Delta with a junior priority date.[6] The priority doctrine does not support the claim.

The priority doctrine simply means the first in time to appropriate water is the first in right. (Civ. Code, § 1414.) Although a water right is the right to the reasonable use of water for a beneficial purpose (§ 1253), the priority doctrine presupposes but does not include the reasonable use of water; the

---

[5] El Dorado has rights to appropriate water from the South Fork of the American River above Folsom Dam, one of the projects.

[6] Although the Board has adopted a policy for the insertion of term No. 91 in permits to appropriate water with priority dates after 1978, it has not done so for permits preceding that date.

water rights stand in the same relation to the water to be taken and differ only in time of acquisition. "[W]hen a conflict arises between two appropriators of water, and their rights are otherwise equal, the prior appropriator will prevail so far as the conflict extends." (*San Bernardino v. Riverside* (1921) 186 Cal. 7, 28 [198 P. 784].)

The authorities cited by the lead opinion provide no support for the opinion. They involve disputes involving conflicting appropriations of the *same* water. (See *Meridian, Ltd. v. San Francisco* (1939) 13 Cal.2d 424, 429 [90 P.2d 537] [contest between "rights of the city [to] water of Tuolumne River . . . and the rights of . . . a riparian owner and appropriator of water downstream from the works of the city"]; *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1234 [99 Cal.Rptr.2d 294, 5 P.3d 853] [claim that "groundwater production" of "upstream water producers . . . was adversely impacting plaintiffs' water supply"]; *United States v. Board, supra,* 182 Cal.App.3d at p. 101 ["[t]he appropriation doctrine confers upon one who actually diverts and uses water [that] is surplus to that used by riparians or earlier appropriators"]; Hutchins: The Cal. Law of Water Rights (1956) p. 131.) The priority doctrine is set forth in Civil Code section 1414 ("As between appropriators, the one first in time is the first in right.").[7]

The priority doctrine does not apply in this case. As noted, none of the junior appropriators appeared in the proceeding below, the Board did not adjudicate claims to water involving them, it is speculative whether any of them would benefit by the use of water bypassed by El Dorado pursuant to term No. 91. The lead opinion wholly departs from analogy to the priority doctrine when it includes among the junior appropriators some that are not in waterways below Folsom Dam and could not intercept water bypassed by El Dorado for use in the Delta.[8]

The policy of the proportionate sharing of water to achieve water quality objectives in the Delta, including the prevention of saltwater intrusion, does not implicate a conflict in the priority of appropriative rights. It involves the water quality objectives set forth in the Delta Plan the Board adopted to implement the Porter-Cologne Act. Because the Delta Plan does not apply to El Dorado, the Board lacks the authority to enforce the objectives by the insertion of term No. 91 in the El Dorado permit.

---

[7] Civil Code section 1414, enacted in 1872, cited by Hutchins, is unchanged since that date and still sets forth the prior appropriation doctrine. (See *State of Arizona v. State of California* (1936) 298 U.S. 558 [80 L.Ed. 1331, 56 S.Ct. 848]; *San Bernardino v. Riverside, supra,* 186 Cal. 7.)

[8] There are many tributaries that contribute water to the Delta. There is nothing in the record that locates the junior appropriators on any particular tributary and it is likely that some are on a tributary not served by Folsom Dam.

As noted, the common law of water rights did not extend to the prevention of saltwater intrusion in the Delta occasioned by the failure of upstream appropriators to provide sufficient flows. (*Antioch v. Williams Irrigation Dist., supra,* 188 Cal. at p. 460 ["Nothing has been placed in the stream above . . . that in the least affects the purity of the water flowing therein."]; see also *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1270 [54 Cal.Rptr.2d 340] ["[The u]se of upstream water to wash out salts downstream is an unreasonable use of water."]; *United States v. Board, supra,* 182 Cal.App.3d at p. 117.)

Lastly, if the Board were to include term No. 91 in the permits of all the affected junior appropriators as well as El Dorado, the result ultimately desired by the lead opinion, none would prevail over the other but all would proportionally contribute water to the Delta to prevent saltwater intrusion and protect fish and wildlife.

II

The Porter-Cologne Act and the Beneficial Use Doctrine

The lead opinion assumes the Board has the quasi-adjudicative authority to enforce the water quality objectives of the Delta Plan notwithstanding that the plan does not apply to El Dorado, but claims the priority doctrine prevails over the objectives even without term No. 91 in the El Dorado permits because the objectives will be met by the release of water from the projects. The opinion is incorrect on both counts.

As noted, there is no common law water right to prevent saltwater intrusion in the Delta and saltwater intrusion is inextricably linked to the quality of water available for domestic consumption and agricultural use. The Board's authority to prevent saltwater intrusion in the Delta derives solely from the exercise of its statutory authority under the Porter-Cologne Act. The Board has no independent authority to impose term No. 91 solely under its quasi-adjudicative authority to impose conditions on permits. (§ 1253.)

"[I]n carrying out its water quality planning function [under the Porter-Cologne Act], the Board possesses broad powers and responsibilities in setting water quality standards." (*United States v. Board, supra,* 182 Cal.App.3d at p. 110.) "[I]n carrying out activities which may affect water quality, [the Board] shall comply with water quality control plans approved or adopted by [it] unless otherwise directed or authorized by statute . . . ." (§ 13247.) This is the exclusive means for regulating excess salinity due to tidal water intrusion. (*United States v. Board, supra,* at pp. 107–111.) "[The Act] unmistakably requires the Board to formulate water quality standards to

provide salinity control to 'ensure the reasonable protection of beneficial uses' (§ 13241) . . . ." (*Id.* at p. 117.)

The Porter-Cologne Act "establishes a comprehensive statewide program for water quality control administered by nine regional boards and coordinated by the state Board. The regional boards are primarily responsible for formulation and adoption of water quality control plans . . . (§ 13240) . . . [b]ut the Board alone is responsible for setting statewide policy concerning water quality control (§§ 13140–13147)." (*United States v. Board, supra,* 182 Cal.App.3d at p. 109.) The act establishes a right in the people to the quality of all water. (§ 13000.) It confers on the Board the authority to adopt regulations to carry out the policy. (§ 13140.) "In fulfilling its statutory imperative, the Board is required to 'establish such water quality objectives . . . as in its judgment will ensure the reasonable protection of the beneficial uses . . . .' " (*United States v. Board, supra,* at pp. 109–110.) In doing so the act commands the Board to consider all competing demands for water in determining what is a reasonable level of water quality protection for the Delta. (§ 13000.) However, the statutory criteria for establishing water quality objectives do not include water rights. (§ 13241; *United States v. Board, supra,* at p. 118, fn. 9.)

The Porter-Cologne Act is enforced by the exercise of the Board's quasi-adjudicative authority to attach "such terms and conditions [to permits] as [the Board] finds are necessary to carry out . . . plans" adopted pursuant to the act. (§ 1258, enacted as part of the Porter-Cologne Act, Stats. 1969, ch. 482, § 12, p. 1048, operative Jan. 1, 1970.)[9] The act also may be enforced incident to the assignment of a 1927 priority date by virtue of section 10504, which provides that the assignment shall "not . . . conflict . . . water quality objectives established pursuant to law."[10]

The application of the Porter-Cologne Act to the Delta was extensively discussed in *United States v. Board, supra,* 182 Cal.App.3d 82, a case

---

[9] Section 1258 reads in pertinent part: "In acting upon applications to appropriate water, the board shall consider water quality control plans which have been established pursuant to [the Porter-Cologne Act], and may subject such appropriations to such terms and conditions as it finds are necessary to carry out such plans."

[10] Section 10504 was enacted in 1967, as part of the predecessor to the Porter-Cologne Act. (Stats. 1967, ch. 284, § 136.2, p. 1447.) Shortly thereafter the Porter-Cologne Act was enacted (Stats. 1969, ch. 482, § 1 et seq., p. 1046). The Porter-Cologne Act "establish[es the] law" pursuant to which a condition requiring the release of water to maintain the water quality in the Delta may be attached to an assignment of 1927 priority rights. That is, the Board may condition a 1927 assignment by limiting the amount appropriated in order to fulfill a water quality objective established under the quasi-legislative authority of the Board (§ 13140) granted it by the Porter-Cologne Act.

the lead opinion does not discuss for its application to this case.[11] It is analogous to this case. The case ruled on the validity of conditions inserted by the Board in permits bearing a 1927 priority date for the appropriation of water by the projects, requiring them to release water to satisfy the water quality objectives the Board established for the Delta. (*United States v. Board, supra,* 182 Cal.App.3d at p. 97.)[12]

Unlike this case, the Board in *United States v. Board* employed its quasi-adjudicative authority to enforce the terms of the Delta Plan, which set new water quality objectives for the Delta. At the same time the Board "implemented those objectives in [its] Decision by modifying the projects' appropriation permits to compel the projects to maintain the established water quality standards." (*United States v. Board, supra,* 182 Cal.App.3d at p. 112.)

"In performing its dual role [quasi-legislative in establishing water quality standards and quasi-judicial in enforcing them], including development of water quality objectives, the Board is directed to consider not only the availability of unappropriated water (§ 174) but also *all* competing demands for water in determining what is a reasonable level of water quality protection (§ 13000). In addition, the Board must consider 'past, present, and probable future beneficial uses of water' (§ 13241, subd. (a)) as well as '[w]ater quality conditions that could reasonably be achieved through the coordinated control of *all* factors which affect water quality in the area' (§ 13241, subd. (c), italics added. Unfortunately, the Board neglected to do so." (*United States v. Board, supra,* 182 Cal.App.3d at p. 118.)

*United States v. Board* said: "In formulating the without project standards, the Board considered only the water use of the Delta parties . . . and the needs of the customers served by the projects . . . . *No attention was given to water use by the upstream users.*" (*United States v. Board, supra,* 182 Cal.App.3d at p. 118, italics added.) That violated the Porter-Cologne Act

---

[11] The lead opinion does not discuss the holding of *United States v. Board,* let alone its application to this case. It fails to acknowledge that the Board has been under a judicial mandate for two decades to extend the Delta Plan to appropriators upstream of the projects but has failed to do so. (See *United States v. Board, supra,* 182 Cal.App.3d at pp. 120, 123–126; cf. *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674 [39 Cal.Rptr.3d 189].) As a backhanded reference to the problem, the lead opinion says that "[t]he Board is under no obligation to require the projects to bear all of the burden of meeting water quality objectives in the Delta indefinitely." (Lead opn., *ante,* at p. 969.)

[12] The court said: "In 1927, the California Legislature . . . authorized the [Department's] predecessor agency to file applications to appropriate water for use in the contemplated CVP. (§§ 10500–10506.) Upon the federal government's assumption of the project, the [Department] assigned its applications to the U.S. Bureau. . . . [T]he principal permits were issued in 1961 (Decision 990). [¶] The [Department also] obtained appropriative rights for operation of the SWP through the permit process, the permits being issued by the Board in 1967 (Decisions 1275 and 1291)." (*United States v. Board, supra,* 182 Cal.App.3d at p. 106.)

because the Board must "consider not only the availability of unappropriated water (§ 174) but also *all* competing demands for water in determining what is a reasonable level of water quality protection (§ 13000)." (182 Cal.App.3d at p. 118.) The court emphasized that the failure was *"the Board's failure to consider upstream users"* in its project only analysis. (*Ibid.*, italics added.) "In short, the Board compromised its important water quality role by defining its scope too narrowly in terms of enforceable water rights." (*Id.*, at p. 120.)

The court concluded: "[T]he Board failed to carry out properly its water quality planning obligations. Because the water quality objectives set at without project level of protection were not established in the manner required by law, *they are found to be invalid.* However, since remand to the Board could serve no useful purpose in light of the Board's announced intention to conduct hearings during 1986 to establish new and revised standards, we reverse the trial court's judgment which commands the Board to reconsider the Water Quality Control Plan. Of course, we would expect the renewed proceedings to be conducted in light of the principles and views expressed in this opinion." (*United States v Board, supra,* 182 Cal.App.3d, at p. 120; see also *id.* at pp. 123–126, italics added, fn. omitted.)

*United States v. Board* was at pains to distinguish between the Board's quasi-legislative authority to establish a plan for the Delta and its quasi-adjudicative enforcement powers to implement the plan by conditions attached to the permits of appropriators subject to the Act.

The Board attempted to enforce the water quality objectives set forth in the Delta Plan on El Dorado without the plan applying to El Dorado. That it cannot do. The Board's authority to place term No. 91 in the El Dorado permit is limited to its enforcement of the Delta Plan.

The lead opinion argues that, notwithstanding the Board's general authority to implement the water quality objectives of the Delta Plan (§ 1253), the priority doctrine prevails because "[i]f El Dorado is allowed to divert when the projects are releasing stored water . . . , the [water quality] objectives will not go unmet. Instead, the projects will simply have to release more stored water to meet the objectives, because the Board has imposed the ultimate obligation for meeting the objectives on the projects (albeit on an interim basis)." (Lead opn., *ante*, at p. 967.) This too is incorrect.

As explained in *United States v. Board*, the failure to include upstream appropriators in the Water Quality Control Plan for the Delta reduces the amount of water available to meet the water quality objectives of the Delta because it is based upon "the unjustified premise that upstream users retained unlimited access to upstream waters, while the projects and Delta parties

were entitled only to share the remaining water flows." (*United States v. Board, supra*, 182 Cal.App.3d at p. 118.)[13]

Conclusion

I would affirm the judgment of the trial court for the reasons set forth above.

---

[13] The court gave an example. "The effect of the Board's failure to consider upstream users may be illustrated: If the upstream users left enough water in the stream flow to provide salinity control 300 days a year, then under the Board's approach the objectives would be to maintain that same level of water quality. In contrast, if upstream diversions and pollution effectively reduced salinity control in the Delta to only 200 days a year, the without project standards would maintain that lower level of water quality. We believe such an approach is legally unsupportable." (*United States v. Board, supra*, 182 Cal.App.3d at p. 118.)